UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TELMA RETARDER, INC.,

       Plaintiff,

v.

MICHAEL BALISH and INDUSTRIAS
ZELU, S.L.,

       Defendants.
                                         /

Case No. 2:17-cv-11378

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION [11]**

Plaintiff Telma Retarder, Inc. filed suit against Defendants Michael Balish and Industrias Zelu, S.L. (which does business under the trade name "KLAM", and will be referred to that way here) and sought declaratory relief. Telma alleges that former employee Balish breached a non-compete agreement, and that he and KLAM tortiously interfered with Telma's business relationships. Also, Telma claims KLAM tortiously interfered with Balish's non-compete agreement. For the reasons stated below, the Court will grant the motion in part and deny it in part.

**BACKGROUND**

Telma manufactures electromagnetic brake systems called "retarders" commonly used in fire trucks and emergency vehicles. Balish worked as Telma's regional sales manager from the early 1980s until 2016. In 2011, he signed an "Employee Agreement" that contained a "Non-Compete" clause. ECF 11-1, PgID 266–68.

In December 2015, Balish's employment with Telma changed from a full-time position to a part-time position. Although the scope of his responsibilities narrowed when he began to work part-time, he retained responsibility over two long-time Telma accounts: Dana, Inc.

and the New York City Fire Department (FDNY). Dana incorporates Telma retarders into its axles and then sells directly to fire-truck and emergency-vehicle manufacturers, while FDNY purchases vehicles equipped with Telma retarders.

Balish resigned from Telma on May 1, 2016, and began to work for Telma's direct competitor: KLAM, a Spanish corporation. According to Telma, Balish has solicited Telma customers—FDNY, KME/REV Group, Inc. (a Telma customer that purchases axles from Dana), Wheeled Coach Industries (an affiliate of KME), and Royal Carting Company—to purchase KLAM retarders. Telma alleges that Balish provided some prospective KLAM equipment to FDNY, and made introductions between KLAM representatives and Telma customers. According to Telma, after arranging one introduction between KLAM and FDNY representatives, Balish stated at a meeting that he had to leave the room due to his non-compete agreement with Telma. By way of damages, Telma claims that Balish's refusal to abide by the non-compete agreement caused FDNY to purchase retarders from KLAM instead of Telma.

Telma filed suit for declaratory relief. Balish answered. Telma's motion for preliminary injunction followed. Telma served KLAM with the complaint, motion for preliminary injunction, and notice of preliminary injunction hearing. ECF 16. KLAM received service of process 30 days before the Court's hearing on the motion for preliminary injunction, but has not filed an appearance or otherwise responded to the complaint or the motion.

**DISCUSSION**

Telma seeks an injunction (1) to prohibit Balish from competing with Telma; (2) to prohibit him from working for KLAM; (3) to prohibit him from disclosing Telma's confidential or proprietary information; (4) to require him to return all Telma information and materials; (5) to prohibit KLAM from tortiously interfering with Balish's non-compete agreement; and

(6) to bar the sale of KLAM retarders to FDNY and any other Telma customers that Balish contacted on behalf of KLAM.

An injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Four factors guide a district court's consideration of a preliminary injunction motion: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). These are "factors to be balanced," not a checklist of prerequisites. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Ultimately, "[t]he purpose of a preliminary injunction is simply to preserve the status quo[.]" *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

I.  Likelihood of Success on the Merits

Telma argues that its underlying claims for breach of the non-compete agreement, tortious interference with a business relationship or expectancy, and tortious interference with a contract will likely succeed on the merits. Balish counters that the non-compete agreement is—for a wide variety of reasons—unenforceable.

A. Declaratory Relief - Breach of Contract

To succeed on a breach-of-contract claim, a plaintiff must prove that "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178 (2014). Michigan law expressly permits a non-compete agreement that "prohibits an employee from

engaging in employment or a line of business" post-termination, so long as it is "reasonable as to its duration, geographical area, and the type of employment[.]" Mich. Comp. Laws § 445.774a(1). Courts routinely impose preliminary injunctions to enforce valid non-compete agreements based on support from "overwhelming case authority[.]" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999).

Here, Balish signed a 2011 Employee Agreement that contained a non-compete clause. ECF 11-1, PgID 266–68. In the Agreement, Balish affirmed that "I will not compete with Telma Retarder . . . in the same or substantially similar duties and capacities of my employment" with Telma Retarder. *Id.* at 268. Balish acknowledged that the non-compete restraint applies to "the United States, Canada, and Mexico, and runs for twelve (12) months after I leave Telma Retarder." *Id.* Additionally, Balish promised to protect Telma's confidential and proprietary information including "customer lists" not in the public domain. *Id.* at 267. Also, Balish agreed that, in the event he were to breach the agreement, Telma could seek to "enjoin such breach," *id.* at 267, and that Michigan law would govern the enforcement of the agreement, *id.* at 268.

To show a likelihood of success on the merits, Telma argues that Balish admitted he breached his non-compete agreement. In his affidavit, Balish acknowledged that he worked for KLAM, Telma's direct competitior in the retarder market. ECF 15-2 ¶ 6. Moreover, Balish stated that "KLAM was a retarder manufacturer . . . seeking to expand its market in the United States. My capacity and duties at KLAM was primarily in consulting with respect to KLAM's efforts to expand its share of the U.S. market[.]" *Id.* ¶ 7. He also stated that "[i]n providing services to KLAM, I have utilized my general knowledge of the retarder market." *Id.* ¶ 12. Balish admitted that he introduced KLAM executives to FDNY representatives, ECF 14 ¶ 54, and to Wheeled Coach employees, *id.* ¶ 66. He also admitted that he

contacted Telma customer Royal Carting representative to "inform[] him that I was working at KLAM." ECF 15-3 ¶ 14. Balish did not deny that he left a meeting between KLAM executives and FDNY employees due to his non-compete. ECF 15-3 ¶ 22. In addition to Balish's own statements, Telma submitted three third-party declarations that Balish solicited business on behalf of KLAM and in competition with Telma. *See* ECF 11-1, PgID 273, 288–89, 292–93, 295–96.

At the outset, Balish argues that several statements in the third-party declarations constitute hearsay or double-hearsay, so they cannot be considered by the Court. But the Court may properly consider documentary support for a motion for preliminary injunction regardless of whether the materials satisfy the rules of evidence. *Mkt. Masters, Inc. v. Clinician's Choice Dental Prod., Inc.*, No. 5:02-cv-24, 2002 WL 32891033, at *7 (W.D. Mich. Oct. 31, 2002) ("[F]ederal courts have held that because of the summary nature of the [preliminary injunction] proceeding a district court may properly rely on hearsay statements, though the district court is also free to give those statements less credence.") *aff'd*, 99 F. App'x 677 (6th Cir. 2004).

    i.  <u>Did the Parties Intend to Be Bound by the 2011 Agreement?</u>

As to the merits, Balish posits numerous legal theories that the 2011 Agreement is unenforceable. First, Balish argues that the 2011 Agreement is not a contract at all. As he points out, the agreement is included in an employee handbook that expressly states "[p]olicies set forth in this handbook are not intended to create a contract . . . [or] contractual obligations of any kind." ECF 15-2, PgID 386. And—Balish notes—the agreement refers to itself as a policy. *Id.* at 369 ("The bold headings that appear below are meant to aid in the reading of this policy[.]"). Additionally, the last page of the handbook,

located after the employee agreement, reiterates that "this handbook is neither a contract of employment nor a legal document." *Id.* at 405.

In light of the above, Balish contends that *Heurtebise v. Reliable Bus. Computers*, 452 Mich. 405, 414 (1996) compels the Court to find that a signature—in a non-binding employee handbook—does not form a binding contract. In *Heurtebise,* the handbook provided that "[f]rom time to time, the company specifically reserves the right, and may make modifications to any or all of the Policies herein, at its sole discretion." *Id.* As a result, the *Heurtebise* court found that the handbook did not create a contract because "the [employer] did not intend to be bound to any provision contained in the handbook[.]" *Id.*

Although the handbook here contains express contractual disclaimers, and allows unilateral change to handbook policies by Telma, Balish's non-compete Agreement does not. In fact, the Agreement says the opposite: "[a]ny changes to this Agreement must be in writing and signed by [Balish] and the General Manager of Telma Retarder." ECF 11-1, PgID 268. And the substance of the Agreement confirms this conclusion: the Agreement provides for the "Enforcement of this Agreement," the availability of damages for breach and attorney's fees for enforcement, permission to bring an enforcement action in any court of competent jurisdiction, the availability of injunctive relief, the severability of invalid clauses, the governance of Michigan law, the assignability of the Agreement, and the complete integration of the Agreement. *Id.* at 266–68. Thus, unlike *Heurtebise*, the form and content of the Agreement here make clear that both Balish and Telma intended to be bound by its terms.

    ii. <u>Did the 2015 Letter Agreement Supersede the 2011 Agreement?</u>

Alternatively, Balish argues that the Letter Agreement he signed in 2015 when he accepted a part-time position superseded his 2011 Agreement. He cites to an unpublished

6

per curiam Michigan Appeals Court decision holding that "[b]ecause both agreements address the terms of [defendant's] employment by plaintiff, we conclude that the latter agreement, without the noncompete clause, supercedes the earlier agreement." *N. Mich. Title Co. of Antrim-Charlevoix v. Bartlett*, No. 248751, 2005 WL 599867, at *2 (Mich. Ct. App. Mar. 15, 2005). Balish argues that his 2015 Letter Agreement contains no restrictions on competition, and he was free to leave for KLAM. Telma argues, however, that *Bartlett* is inapposite because Balish's 2015 Letter Agreement did not "completely cover" all the terms of his employment, *Omnicom of Michigan v. Giannetti Inv. Co.*, 221 Mich. App. 341, 347 (1997), and so did not supercede the 2011 Agreement.

As an initial matter, some notable differences distinguish *Bartlett* from the facts here. The *Bartlett* court reasoned that the second employment agreement superseded the first because "[w]hen two agreements cover the same subject matter and include inconsistent terms, the latter agreement supercedes the earlier agreement." *Bartlett*, 2005 WL 599867, at *2. But the Agreements here do not contain "inconsistent terms." Rather, they address completely different aspects of Balish's employment. The 2015 Letter Agreement covers Balish's pay, job description, and hourly requirements while the 2011 Agreement covers legal compliance, moonlighting, rights related to inventions, non-disclosure of confidential information, enforcement, computer security, return of Telma property, exit interviews, non-competition, severability, governing law, and assignability. The 2011 Agreement omits mention of Balish's pay, benefits, or hours; the 2015 Letter Agreement omits mention of Balish's various legal obligations. Thus, *Bartlett* is inapposite because the Agreements address discrete aspects of Balish's employment with Telma.

To determine whether the parties intended the 2015 Letter Agreement to supersede the 2011 Agreement, the Court must look first to the text of the contract. *See, e.g.*, *Klapp*

7

*v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 469 (2003). The 2015 Letter Agreement contains no integration clause or any other indication that the parties intended it to supersede previous agreements. *See* ECF 11-1, PgID 276. The 2011 Agreement, however, contains an integration clause that states "[t]his Agreement is the entire Agreement between Telma Retarder and me and takes the place of all previous understandings or agreements whether written or oral, concerning the subject matter of this Agreement." *Id.* at 268. Although not dispositive, the lack of an integration clause in the 2015 Letter Agreement—coupled with the presence of an integration clause in the 2011 Agreement—strongly suggests that the parties did not intend the later contract to supersede the earlier contract. *See Archambo v. Lawyers Title Ins. Co.*, 466 Mich. 402, 414 n.16 (2002).

Moreover, if the Court were to consider extrinsic evidence to clarify any ambiguity as to whether the parties intended the 2015 Letter Agreement to supersede the 2011 Agreement, *Stine v. Cont'l Cas. Co.*, 419 Mich. 89, 113 (1984), the result would become more clear. In the time since Balish signed the 2015 Letter Agreement, he has made at least two statements relevant to the parties' intent. In his first letter to Telma, Balish stated "I will honor the non-compete agreement and not compete with Telma." *See* ECF 11-1, PgID 301. A few months later, in another letter, Balish stated that the promise he made in his first letter "has not been deviated from and has and will continue to be honored until the non-compete agreement has expired. I have not and will not violate the terms of my agreement[.]" *Id.* at 306.

As Balish's comments make unmistakable, he did not consider the 2015 Letter Agreement to have abrogated his non-compete obligations under the 2011 Agreement. Therefore, based on the text of the Agreements and Balish's statements, the Court finds

that the parties did not intend the 2015 Letter Agreement to supersede the 2011 Agreement.

### iii. Was Balish Involuntarily Terminated?

Next, Balish argues the 2011 Agreement's non-compete restrictions do not apply because his employment was involuntarily terminated without cause. The documentary evidence shows that Balish was offered a part-time position, and he accepted it. *See* ECF 11-1, PgID 276. His salary and his 401k contributions from Telma continued uninterrupted after he moved to the part-time position, *id.*, and his employee identification number remained unchanged, *id.* at 279–80. There is no indication that Balish was involuntarily terminated.

### iv. Are the Terms of the Non-Compete Agreement Reasonable?

Balish also submits that the non-compete agreement is unenforceable because it is unreasonable. "[A] non-compete agreement is enforceable provided it is reasonable with respect to duration, geographical area, and the line of business it seeks to limit." *Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1115–16 (E.D. Mich. 1997). Here, the Agreement imposes reasonable restrictions: a one-year time limit, a geographic scope aligned with Balish's territory when he worked for Telma, and a restriction on positions substantially similar to retarder sales and solicitation. *See, e.g.*, *Kelly Srvs. v. Eidnes*, 530 F. Supp. 2d 940 (E.D. Mich 2008) (finding one-year non-compete restriction reasonable); *Superior Consulting Co., Inc. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (finding non-compete geographical restriction based on scope of employer's legitimate business interests reasonable).

### v. Has Telma Established a Breach of the Non-Compete?

9

Next, Balish argues that Telma has not established a breach of the non-compete agreement. Balish notes that the non-compete only bars work in a "substantially similar" position. He contends that he worked in a different capacity for KLAM than for Telma, and that Telma's proposed injunction—barring Balish from working for KLAM in any capacity—impermissibly expands the scope of the non-compete agreement. Telma contends that Balish cannot be trusted to work for KLAM in any capacity, since he has blatantly disregarded his non-compete agreement.

In the 2011 Agreement, Balish promised that "I will not compete with Telma retarder . . . in the same or substantially similar duties and capacities of my employment" with Telma. ECF 11-2, PgID 268. Regardless of the official job title KLAM assigned to Balish, the evidence produced tends to show that he has been employed by KLAM in a position substantially similar to the one he held at Telma: helping to sell retarders. But the Court agrees with Balish that an injunction completely barring Balish from working for KLAM would exceed the scope of the non-compete agreement.

### vi. Did the Non-Compete Agreement Expire?

Lastly, Balish submits that the non-compete expired one year after he left his employment with Telma. His argument is unavailing. The factual record shows that Balish has repeatedly and knowingly violated his non-compete agreement. Balish served as a consultant to KLAM—Telma's direct competitor in the retarder market—to "expand its share of the U.S. market[.]" ECF 15-2 ¶ 7. While working for KLAM, he used his "general knowledge of the retarder market," *id.* ¶ 12, and introduced KLAM executives to the same customers he serviced as a Telma employee, ECF 11-1, PgID 273, 288–89, 292–93, 295–96; *see also* ECF 14 ¶ 54, 66. Since Balish's conduct constituted a "flouting" of the agreement, the Court will "extend injunctive relief beyond the term of [his] non-competition

agreement." *Superior Consultant Co. v. Bailey*, No. 00-CV-73439, 2000 WL 1279161, at *12 (E.D. Mich. Aug. 22, 2000)

In sum, the Court finds the non-compete agreement to be an enforceable contract. Balish's statements, coupled with other documentary evidence of Balish meeting and soliciting Telma customers on behalf of KLAM, indicate that Telma has a strong likelihood of success on the merits in its non-compete breach claim.

B. Declaratory Relief - Tortious Interference

Telma also argues that the underlying claims for tortious interference also will likely succeed on the merits. Balish contends that Telma's tortious-interference claims fail because the non-compete agreement is not enforceable and because there has been no clear breach of the agreement.

"The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 89–90 (2005). "The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Id.* at 90.

Telma has marshaled strong evidence to support its tortious-interference claims. *See* ECF 11-1, PgID 266–68 (Balish's signed employment agreement with non-compete clause), *id.* at 273, 288–89, 292–93, 295–96 (declarations that Balish solicited business on

behalf of KLAM and in competition with Telma), ECF 15-2, ¶¶ 7, 12 (Balish's affidavit stating that he used his "general knowledge of the retarder market" to provide services to KLAM and worked for KLAM as a consultant "with respect to KLAM's efforts to expand its share of the U.S. market").

The Court finds that the factual record supports Telma's claim that Balish breached his non-compete agreement, that he and KLAM tortiously interfered with Telma's business relationships, and that KLAM tortiously interfered with Telma's non-compete agreement with Balish. As a result, the Court concludes that Telma has a strong likelihood of success on the merits. The factor weighs in favor of a preliminary injunction.

II. <u>Irreparable Injury</u>

Telma argues that the loss of customer goodwill alone constitutes an irreparable injury. *See, e.g., Brown Dairy Equip., Inc. v. Lesoski*, No. 291372, 2010 WL 4485919, at *2 (Mich. Ct. App. Nov. 9, 2010) ("[G]oodwill is of considerable value[.]"). Balish counters that economic harm alone (e.g. Telma's loss of retarder contract with FDNY) is not irreparable harm.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013). "Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." *Id.* A former employee's use of proprietary information on behalf of a competitor can cause irreparable harm. *See, e.g.*, *Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 659 (E.D. Mich. 2007) (finding a risk of irreparable harm because "it appears that Defendant's expansive knowledge of Kelly's business systems and operations

12

will result in a loss of the customer goodwill developed by Kelly."); *Lowry*, 984 F. Supp. at 1116 ("[W]orking for a direct competitor in a similar area, [Defendant's] knowledge is bound to have a significant adverse impact on Lowry's business. The injury will be irreparable if Lowry loses customers it has spent years and significant resources obtaining.").

Here, factual materials demonstrate that Telma will likely suffer an irreparable injury from Balish's continued solicitation of their customers in violation of the non-compete, and Balish's and KLAM's continued tortious interference. The potential for Telma to lose "customer goodwill and fair competition" supports a finding of irreparable harm "because the resulting damages are difficult to calculate." *Superior Consulting*, 851 F. Supp. at 847. Therefore, the factor weighs in favor of an injunction to prohibit any additional loss of customer goodwill.

But the factor weighs against Telma's request to enjoin the sale of KLAM goods. "In order to establish irreparable injury, the moving party must demonstrate a noncompensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty." *Thermatool Corp. v. Borzym*, 227 Mich. App. 366, 377 (1998). If KLAM is liable for damages from any sales proximately caused by its tortious conduct, *see* ECF 11-1, PgID 293 (FDNY change order and potential purchase order for 70 KLAM-equipped fire vehicles), monetary damages are available to compensate Telma.

III.   Harm to Others

Telma acknowledges that an injunction may harm Balish and KLAM, but does not address whether an injunction will cause harm to FDNY or any other third-party customers who have decided to purchase retarders from KLAM. Balish argues that Michigan law precludes a preliminary injunction that bars dealing with a customer because "[t]he rights

of innocent third parties should not be sacrificed in formulating a[n] [injunctive] remedy." *Hayes-Albion v. Kuberski*, 421 Mich. 170, 189 (1984) (reversing overbroad injunction that unduly restricted "[t]he right of customers to choose their suppliers").

The Court is mindful that an injunction of KLAM's sale of retarders to FDNY, for example, could cause a disruption to the FDNY's maintenance of emergency vehicles. Also, Telma has provided insufficient evidence to show that Balish's conduct was a but-for cause of the sale to FDNY. An injunction of the sale of retarders from KLAM to customers like FDNY would be overbroad and would punish non-parties to the litigation, and essentially force them to purchase their products from Telma. The factor weighs against the entry of a preliminary injunction to bar the sale of KLAM retarders to customers contacted by Balish on behalf of KLAM.

IV. Public Interest

Telma argues that public interest favors the enforcement of contracts. Balish does not address public interest. Thus, the factor weighs in favor of granting a preliminary injunction because "[t]he public interests in protecting confidential information and in enforcing valid employment contracts . . . weigh in favor of issuing [a] preliminary injunction." *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 904 (E.D. Mich. 2005).

The Court has balanced the factors and determined that Telma has a strong likelihood of success on the merits, and faces the risk of irreparable harm. Accordingly, the Court will enjoin Balish from continued violations of the non-compete, Balish and KLAM from continued tortious interference with Telma's business expectancies, and KLAM from continued tortious interference with Balish's non-compete agreement. But the risk of harm to others weighs against an injunction prohibiting sales from KLAM to third-party

customers. Since Telma has not submitted a proposed preliminary injunction, the Court will ask the parties to confer and file a joint proposed preliminary injunction.

## ORDER

**WHEREFORE** it is hereby **ORDERED** that Plaintiff's amended motion for preliminary injunction [11] is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that the parties **JOINTLY SUBMIT** proposed terms for the preliminary injunction based on the Court's analysis above. The parties shall set forth as much agreed-upon language as possible as to the injunction's term, scope, and duration. The parties shall submit the proposed injunction **within 10 days** from the date of this order.

**IT IS FURTHER ORDERED** that the Court finds Plaintiff's motion for preliminary injunction [2] **MOOT.**

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
Dated: August 2, 2017         United States District Judge

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 2, 2017, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager